**Case No. 22-5112**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,     )
            )
    Plaintiff-Appellee,     )
            )
    v.     )
            )
PAMELA KATHRYN CONLEY,     )
            )
    Defendant-Appellant.     )

---

On Appeal From The District Court For The Northern District of Oklahoma
The Honorable John F. Heil, III, Chief Judge
D.C. No. 4:21-cr-00064

---

**APPELLANT'S OPENING BRIEF**

---

Respectfully submitted,

LYNN C. HARTFIELD
CJA Attorney for Defendant-Appellant
Law Office of Lynn C. Hartfield, LLC
387 Corona Street, Suite 617
Denver, Colorado 80218
(720) 588-0571
lynn@lhartfieldlaw.com

Oral Argument is requested
PDF FORMAT ATTACHMENTS ARE INCLUDED

June 30, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF PRIOR OR RELATED APPEALS.........................v

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE AND FACTS ......................................2

SUMMARY OF THE ARGUMENT ..................................................5

ARGUMENT ....................................................................................7

I.     THE DISTRICT COURT MISAPPLIED THE GUIDELINE FOR
      LOSS UNDER USSG § 2B1.1, RESULTING IN AN INCORRECT
      GUIDELINE DETERMINATION ........................................................7

      A. Preservation and Standard of Review...................................7
      B. Relevant Guideline ..............................................................7
      C. The District Court Misapplied the Guideline, Because it Mistakenly
          Believed That Crediting Amounts Repaid Would Convert Intended
          Loss to Actual Loss............................................................10

II.    IN LIGHT OF THE SUPREME COURT'S RECENT DECISION IN
      *DUBIN V. UNITED STATES*, 599 U.S. ___ (2023), MS. CONLEY'S
      PLEA TO AGGRAVATED IDENTITY THEFT UNDER 18 U.S.C.
      § 1028A MUST BE VACATED, AS IDENTITY THEFT WAS NOT
      THE CRUX OF THE UNDERLYING OFFENSE ............................18

      A. Preservation and Standard of Review ...............................18
      B. The *Dubin* Opinion Significantly Narrows the Applicability of 18
          U.S.C. § 1028A, Taking Ms. Conley's Admitted Conduct Outside Its
          Scope .................................................................................19
      C. In Light of *Dubin*, the District Court Plainly Erred In Finding a
          Sufficient Factual Basis for Ms. Conley's § 1028A Pleas....................24
      D. The Error Affected Ms. Conley's Substantial Rights, and Undermines
          the Fairness and Integrity of the Judicial Proceedings ........................27

CONCLUSION.......................................................................................................30

STATEMENT REGARDING ORAL ARGUMENT ........................................31

CERTIFICATE OF COMPLIANCE.....................................................................32

CERTIFICATE OF SERVICE ...............................................................................32

ATTACHMENTS

    Attachment 1
        Judgment in USDC ND Okla. No. 4:21-00064
    Attachment 2
        Excerpt of Sentencing Hearing, November 18, 2022

# TABLE OF AUTHORITIES

## CASES

*Dubin v. United States*, 599 U.S. ___, 143 S.Ct. 1557 (2023) .............................passim

*Flores-Figueroa v. United States*, 556 U.S. 646  (2009) .................................. 22

*Jones v. United States*, 529 U.S. 848 (2000) ................................................. 22

*United States v. Brownell*, 495 F.3d 459 (7th Cir. 2007) ............................... 9

*United States v. Carillo*, 860 F.3d 1293 (10th Cir. 2017) ...................... 29, 30

*United States v. Conner*, 811 Fed. Appx. 787 (3d Cir. 2020)........................ 9

*United States v. Cristerna-Gonzalez*, 962 F.3d 1253 (10th Cir. 2020). .......... 18

*United States v. Crowe*, 735 F.3d 1229 (10th Cir. 2013) ...................... 8, 9, 15

*United States v. Dubin*, 47 F.4th 1021 (5th Cir. 2022) ............................... 21

*United States v. Ellis*, 152 Fed. Appx. 298 (4th Cir. 2005) ......................... 9

*United States v. Ferrel*, 603 F.3d 758 (10th Cir. 2010). ............................. 30

*United States v. Gatwas*, 910 F.3d 362 (8th Cir. 2018) .............................. 20

*United States v. Hong*, 938 F.3d 1040 (9th Circuit 2019) .......................... 20

*United States v. James*, 592 F.3d 1109 (10th Cir. 2010) ............................ 17

*United States v. Kieffer*, 681 F.3d 1143 (10th Cir. 2012)............................. 9

*United States v. Landeros-Lopez*, 615 F.3d 1260 (10th Cir. 2010).......... 27, 28, 29

*United States v. Martinez*, 690 F.3d 1083 (8th Cir. 2012).......................... 10

*United States v. Maynard*, 984 F.3d 948 (10th Cir. 2020)............................ 7

*United States v. Medlock*, 792 F.3d 700 (6th Cir. 2013) ............................................... 20

*United States v. Michael*, 882 F.3d 624 (6th Cir. 2018) ............................................... 20

*United States v. Munksgard*, 913 F.3d 1327 (11th Cir. 2019) ..................................... 19

*United States v. Porter*, 745 F.3d 1035 (10th Cir. 2014)............................................. 19

*United States v. Torres-Duenas*, 461 F.3d 1178 (10th Cir. 2006) ................................ 18

*United States v. Wieck*, 2021 WL 4949177 (10th Cir. Oct. 25, 2021)........................ 16

*United States v. Yurek*, 925 f.3d 423 (10th Cir. 2019)..................................................... 7

## STATUTES

18 U.S.C. § 1028A.........................................................................................passim

18 U.S.C. § 1344 ..................................................................................................... 2, 26

18 U.S.C. § 3231 ........................................................................................................... 1

18 U.S.C. § 3553 ......................................................................................................... 29

18 U.S.C. § 3742 ........................................................................................................... 1

28 U.S.C. § 1291 ........................................................................................................... 1

## RULES

Fed. R. Crim. P. 11 ...................................................................................................... 18

## OTHER AUTHORITIES

H.R. Rep. 108-528 (2004) ..................................................................................... 26, 27

USSG § 2B1.1...................................................................................................passim

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no known prior or related appeals.

# STATEMENT OF JURISDICTION

This is a direct appeal of a conviction and sentence. The district court for the Northern District of Oklahoma had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Judgment was entered on November 23, 2022. (v.1 at 224)[1] (Attachment 1), and notice of appeal was timely filed on December 2, 2022. (v.1 at 231). Ms. Conley is currently incarcerated in a non-Bureau of Prisons facility, and there is no determined release date as of the time of the filing of this brief.

# STATEMENT OF THE ISSUES

I.    WHETHER THE DISTRICT COURT MISAPPLIED THE GUIDELINE FOR LOSS UNDER USSG § 2B1.1, RESULTING IN AN INCORRECT GUIDELINE DETERMINATION

II.    WHETHER, IN LIGHT OF THE SUPREME COURT'S RECENT DECISION IN *DUBIN V. UNITED STATES*, 599 U.S. ___ (2023), MS. CONLEY'S PLEA TO AGGRAVATED IDENTITY THEFT UNDER 18 U.S.C. § 1028A MUST BE VACATED, AS IDENTITY THEFT WAS NOT THE CRUX OF THE UNDERLYING OFFENSE

---

[1] References to the record shall be denoted by the Appellate Record volume number, followed by the appropriate page number. References to the docket shall be denoted by the abbreviation "DE," followed by the docket number. Because this appeal is filed by appointed counsel pursuant to the Criminal Justice Act, an appendix is not included, per 10th Cir. R. 10.2(A).

## STATEMENT OF THE CASE AND FACTS

This case arose from an investigation into multiple bank loans suspected to be fraudulently obtained by Appellant Pamela Conley. On February 23, 2021, a grand jury returned a 19-count indictment charging Ms. Conley with 16 counts of bank fraud, pursuant to 18 U.S.C. § 1344, and three counts of aggravated identity theft, pursuant to 18 U.S.C. § 1028A(a)(1). (v.1 at 19). As detailed in the indictment, the government alleged that between September 2016 and November 2021, Ms. Conley executed a scheme to obtain loans from seven financial institutions by using falsified employment and salary information. (*Id*. at 19-24). With respect to the aggravated identity theft counts, the indictment alleged that "during and relation to" the commission of the alleged bank fraud, Ms. Conley used the names and signatures of three financial institution employees to obtain false lien releases, enabling her to pledge an automobile and a boat as collateral even though the property was encumbered. (*Id*. at 24). Ms. Conley made her initial appearance on February 25, 2021, and after a hearing held the following day, was ordered detained. (v.1 at 34).

Over the next six months, the government filed two superseding indictments, adding, in total, eight new bank fraud counts, as well as an additional count of aggravated identity theft. (v.1 at 40-48; 71-83). The new identity theft count identified a fourth person whose name was used to obtain a false lien release on a

second boat, but the allegations were otherwise substantively the same as in the original indictment. (*Id.* at 81). Ms. Conley ultimately pled guilty, without a plea agreement, to all 28 counts in the second superseding indictment. (v.1 at 181).

The 24 bank fraud counts involved the following financial institutions and loans, listed by date and loan amount:

| Count | Date | Bank | Amount |
|---|---|---|---|
| 1 | 9/6/16 | First Oklahoma Federal Credit Union | $72,111.00 |
| 2 | 10/28/16 | Oklahoma Central Credit Union | $70,523.25 |
| 3 | 6/15/17 | Oklahoma Central Credit Union | $60,164.12 |
| 4 | 11/30/17 | Oklahoma Central Credit Union | $ 8,400.00 |
| 5 | 11/30/17 | First Pryority Bank | $36,250.00 |
| 6 | 3/7/18 | First Pryority Bank | $76,622.57 |
| 7 | 4/23/18 | First Pryority Bank | $14,000.00 |
| 8 | 12/19/17 | Western Sun Federal Credit Union | $45,320.00 |
| 9 | 12/28/17 | Western Sun Federal Credit Union | $16,362.00 |
| 10 | 2/12/18 | Western Sun Federal Credit Union | $50,645.17 |
| 11 | 5/4/18 | Western Sun Federal Credit Union | $20,021.00 |
| 12 | 5/16/18 | Red Crown Credit Union | $45,401.25 |
| 13 | 5/18/18 | Red Crown Credit Union | $50,521.61 |
| 14 | 6/22/18 | Red Crown Credit Union | $50,859.50 |
| 15 | 3/28/19 | Equity Bank | $35,211.00 |
| 16 | 11/30/18 | Tinker Federal Credit Union | $44,237.37 |
| 17 | 12/13/18 | Tinker Federal Credit Union | $49,448.89 |
| 18 | 1/11/19 | Tinker Federal Credit Union | $25,032.25 |
| 19 | 1/30/19 | Tinker Federal Credit Union | $78,860.97 |
| 20 | 2/19/19 | Tinker Federal Credit Union | $35,032.25 |
| 21 | 11/17/20 | Yorktown Bank | $35,209.00 |
| 22 | 12/15/20 | Spirit Bank | $48,410.00 |
| 23 | 12/22/20 | Spirit Bank | $30,000.00 |
| 24 | 12/28/20 | Grand Savings Bank | $30,000.00 |
| | | **Total Loans Sought:** | $ 1,028,643.20 |

(v.1 at 79-80). Ms. Conley successfully obtained all of the above loans except for the December 22, 2020 loan from Spirit Bank, which was denied. (v.1 at 80).

Although Ms. Conley entered her plea on September 22, 2021, the sentencing hearing did not occur for an entire year. The record is not entirely clear regarding the reasons for the delay. The sentencing hearing was originally set for March 29, 2022 (DE 75), then was stricken based on an oral request by the Probation Office (DE 82). The hearing was then set for September 23, 2022, following disclosure of the Presentence Investigation Report ("PSR"). (DE 83).

Prior to sentencing, Ms. Conley transmitted objections to the PSR to the Probation Office.[2] Relevant to this appeal, she challenged the PSR's calculation of the loss amount, which impacts the ultimate guideline range. Specifically, USSG § 2B1.1 provides for a graduated series of increases to a defendant's offense level, based on the dollar amount of the victims' losses. *See* USSG § 2B1.1(b)(1). The Commentary to § 2B1.1 provides further (albeit confusing) guidance on how to determine the loss amount, including how to account for unrealized losses, and circumstances under which money returned to the victim must be credited against the total loss. *See generally*, § 2B1.1, comment. (n.3).

---

[2] In the Northern District of Oklahoma, objections to the PSR are not filed with the court and are not reflected on the docket. However, the PSR reflects that the Probation Office received objections from Ms. Conley through her first attorney, Keith Ward, as well as from substitute counsel Meredith Curnette, who was appointed on September 20, 2022 (v.1 at 212; v.5 at 403).

The district court overruled Ms. Conley's objections, and calculated the loss amount to be the total amount of loans sought or obtained ($1,028, 643.20), minus a small reduction to reflect the value of an automobile that was returned to one of the lenders. (v.3 at 43; v.5 at 390, 404). The court ordered restitution in the amount of $451,065.64 based on a calculation provided by the Probation Office, after incorporating reductions provided by the parties at sentencing. (v.5 at 400-01; v.3 at 48-63).

Ms. Conley's guideline range was then calculated as follows:

| | |
|---|---|
| Base offense level per USSG § 2B1.1(a)1 | 7 |
| Increase for loss amount between $550,000 and $1.5 million | +14 |
| Reduction for acceptance of responsibility | - 2 |

| | |
|---|---|
| Total offense level | 19 |

Because Ms. Conley had no criminal history points, her advisory guideline range was 30-37 months. The court sentenced her to 30 months for the bank fraud counts, with a mandatory consecutive 2-year sentence for the aggravated identity theft counts, resulting in a total sentence of 54 months imprisonment, to be followed by three years supervised release. (v.1 at 224-26). This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erred in the methodology it employed to calculate the loss amount for purposes of calculating the offense level under the Sentencing Guidelines. The Commentary to USSG § 2B1.1 directs that in calculating the loss

amount in a financial case, a court is to first determine the total intended loss and total actual loss to the victim(s), and then use the greater of the two as a starting point. However, loss, whether actual or intended, is subject to reductions for money returned to the victim(s) prior to the detection of the offense, and for the value of collateral recovered. In this case, the district court failed to credit Ms. Conley for amounts repaid to the victims, and failed to credit her for the value of collateral recovered. Because the record lacks a detailed accounting of the amount and timing of payments to the victims, and lacks information as to collateral recovered, the case must be remanded for resentencing.

On June 8, 2023, the Supreme Court issued an opinion in *Dubin v. United States*, 599 U.S. ___ (2023). In *Dubin*, the Court held that the statute criminalizing aggravated identity theft, 18 U.S.C. § 1028A, had been read too broadly, sweeping in conduct that was only an ancillary feature of the crime at issue and that, viewing the statute in the context of its title and intent, it can only be applied in cases where the use of another's identity is at the "crux" of the offense. Here, as in *Dubin*, Ms. Conley's "use" of others' identity was an ancillary feature of the offense rather than the core conduct. Because plain error is assessed at the time of the appeal, rather than at the time of trial, this Court is bound to follow *Dubin*, and Ms. Conley's convictions for aggravated identity theft must be vacated.

**ARGUMENT**

I.    THE DISTRICT COURT MISAPPLIED THE GUIDELINE FOR LOSS UNDER USSG § 2B1.1, RESULTING IN AN INCORRECT GUIDELINE DETERMINATION

A. <u>Preservation and Standard of Review</u>

As reflected in the PSR, Ms. Conley filed objections to the loss calculation with the Probation Office. (v.5 at 403-04). She also detailed her objections during her sentencing hearing, as reflected in the transcripts found at v.3 at 40-48. The district court's oral ruling is found at v.3 at 47-48 (Attachment 2).

A district court's loss calculation methodology under the Guidelines is reviewed *de novo*, with underlying factual findings reviewed for clear error. *United States v. Maynard*, 984 F.3d 948, 956 (10th Cir. 2020); *United States v. Yurek*, 925 f.3d 423, 442 (10th Cir. 2019).

B. <u>Relevant Guideline</u>

United States Sentencing Guidelines § 2B1.1 governs the offense level calculation for financial crimes, including bank fraud under 18 U.S.C. § 1344. The guideline provides for a base offense level of 7 for financial crimes with a statutory maximum penalty of 20 years or more, and then provides for a graduated series of enhancements based on the total loss amount. USSG § 2B1.1(b)(1).

The guideline does not define the term "loss," but provides extensive guidance on how to calculate loss in the Commentary to § 2B1.1. *See* § 2B1.1,

comment. (n.3). The general rule, the Commentary provides, is that "subject to the exclusions in subdivision (D), loss is the greater of actual or intended loss." *Id*. at n.3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." *Id*. at n.3(A)(i) and (ii).

Subsection (D) of the Commentary provides that loss "shall not include" "interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs," and provides that costs of prosecution and investigation are similarly not included. § 2B1.1, comment. (n.3(D)). The Commentary further provides that loss "shall be reduced by" "money returned, and the fair market value of the property returned … by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected," and additionally provides that in cases involving pledged collateral, loss shall be reduced by, "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." § 2B1.1, comment. (n.3(E)(i) and (ii)). Significantly, the reduction for collateral is timed to the sentencing hearing, not to the time of detection of the offense. *United States v. Crowe*, 735 F.3d 1229, 1238 (10th Cir. 2013). The government has the burden of

proving loss by a preponderance of the evidence. *United States v. Kieffer*, 681 F.3d 1143, 1168 (10th Cir. 2012).

This Court has interpreted the operation of these provisions to call for a two-step process: first, the court determines the intended loss and the actual loss, and uses the greater of the two as a starting point; second, the court determines whether to apply credits against loss – whether actual or intended - pursuant to Commentary Note 3(E). *Crowe*, 735 F.3d at 1237 ("if we were to state the method for determining 'loss' for purposes of § 2B1.1(b)(1) as a mathematical equation, it would be as follows: loss equals actual loss (or intended loss) minus credits against loss"). Other circuits have similarly held that the value of amounts recovered must be deducted from the loss amount, whether actual or intended, so long as any funds were repaid prior to detection of the offense. *See, e.g., United States v. Conner*, 811 Fed. Appx. 787, 792-93 (3d Cir. 2020) (unpublished) (finding district court plainly erred in failing to deduct from loss amount funds deposited into victim's account before offense was discovered); *United States v. Ellis*, 152 Fed. Appx. 298, 300 (4th Cir. 2005) (unpublished) (finding that district court plainly erred when it determined loss amount without deducting the amount recovered from collateral pledged or otherwise provided by the defendant); *United States v. Brownell*, 495 F.3d 459, 463-64 (7th Cir. 2007) (holding that Application Note 3(E)(i) requires courts to credit against intended loss all funds returned to the victim, so long as the

repayment occurs before the crime is detected); *United States v. Martinez*, 690 F.3d 1083, 1087 (8th Cir. 2012) (in fraudulent loan case, district court correctly calculated loss by deducting from the intended loss all amounts recovered through pledged collateral, and rejecting government's contention that only the intended loss was relevant). Thus, in this case the court was required to first determine the actual loss amount and the intended loss amount, and then subtract from the greater of those two figures any amounts returned to the victim financial institutions prior to detection of the offense, and credit the value of any collateral pledged on which the financial institutions were able to recover.

C. <u>The District Court Misapplied the Guideline, Because it Mistakenly Believed That Crediting Amounts Repaid Would Convert Intended Loss to Actual Loss</u>

In order to understand the district court's loss calculation methodology, it is helpful to understand the parties' positions.

Following receipt of the PSR, Ms. Conley's counsel transmitted objections to the report to the Probation Officer. In addition to an objection to a guideline increase for number of victims, with which the Probation Officer concurred, Ms. Conley objected to the loss amount calculation. (v.5 at 403-04). Specifically, she contended that the intended loss amount should have been reduced by the amount paid off on the loans and by collateral on which the institutions were able to collect. (*Id.*). Accordingly, Ms. Conley argued the loss amount should have been reduced to

the amount calculated as restitution owed to the financial institutions. (*Id*.). That figure, broken down by institution, totaled $462,884.48, and would have resulted in a 12-level, rather than the proposed 14-level, enhancement to her base offense level. (*Id*. at 400-401).

The Probation Office disagreed. As it explained, Ms. Conley obtained, or attempted to obtain, fraudulent loans totaling $1,028.643, which the PSR author concluded reflected the intended loss. (v.5 at 404). The Probation Office did credit Ms. Conley $8,051.38 to reflect the fair market value of an automobile returned to one of the banks, but otherwise left the loss amount unchanged. (*Id*.). The government also submitted a response to Ms. Conley's objections, arguing that the Commentary to § 2B1.1 directs that the court apply the greater of the actual or intended loss, and that the fact that Ms. Conley paid back some of the loans should not reduce the loss amount for purposes of the guideline loss calculation. (v.5 at 370).

On November 18, 2022, the district court held a sentencing hearing. At the hearing, Ms. Conley's counsel elaborated on her argument with respect to the loss amount. Loss calculation, she explained, involves first determining the greater of intended or actual loss, and then, pursuant to Note 3(E)(i) of the Commentary to USSG § 2B1.1, the court was required to credit against the loss any money

returned or collateral recovered, so long as the funds were returned prior to detection of the offense. (v.3 at 40-42).

From there, the transcript becomes confusing. When the court inquired as to what amounts the defense contended should be deducted, counsel answered:

> Your Honor, the loans that resulted in some of the defaults and that were included in the restitution calculation total $ 640,795.25. Of those loans, payments were made on them, offsets were made with cash that was held in checking accounts at those different institutions as well as collateral was collected and sold … in order to offset.

(v.3 at 42). No explanation was provided for the discrepancy between the total in the indictment and the defense's new figure of $640,795.25. When pressed by the court regarding which amounts should be deducted from the $1 million-plus intended loss figure, counsel responded "I believe the total loss amount should be the same as the restitution amount, that was the amount of money actually lost." (v.3 at 42).

This comment led the court back to the original determination of intended versus actual loss, and what should be deducted from the intended loss. (*Id.* at 43). Counsel then returned to the $640,795 figure, which she explained was the amount of the loans that had been defaulted upon, and repeated that the reduction for amounts repaid would be the same amount as the calculated restitution. (v.3 at 44).

The court, even more confused by then, attempted to parse the defense argument:

> I think we're mixing two things. I think in your answer you're mixing the actual loss versus the intended loss. And I'm trying to separate those things out, because I'm not calculating the loss here based upon the actual loss; I'm calculating it based upon the intended loss, and we've done that, and that's what's set forth in the presentence report. And my inclination is to adopt that number, but if you're telling me that number doesn't take into account certain monies that were returned that need to be deducted, then I'm willing to consider that. And are you suggesting to me that any amount I order in restitution should be deducted from the intended loss? Are you suggesting that?

(v.3 at 44). This led to further confusion, with the court again attempting to draw a distinction between actual and intended loss, and the defense urging that the intended loss would be the same as the total restitution figure. (v.3 at 45).

The court, though, finally seemed to understand the procedural argument, summarizing it as follows:

> Okay. So pursuant to U.S. Sentencing Guideline, Section 2B1.1, Comment Note 3(E), indicates ways that loss can be reduced. And if I understand correctly, the defendant argues that because her loans were collateralized by checking accounts, vehicles and other property, because many of the loans were paid off with proceeds of new loans, and because various institutions recovered and/or set-off collateral, she's entitled to have the loss reduced in the amount of the restitution. Do I understand that correctly? Is that your objection?

(v.3 at 48). The defense, however, confused things further, by arguing that that amounts repaid or collateral on which the financial institutions were able to collect reduced the amount of loss Ms. Conley intended (step one of the two-step process), rather than simply served as offsets (via step two of the two-step process). (v. 3 at 46).

The government then chimed in. characterizing Ms. Conley as "conflating intended loss and actual loss," and noting that defendants were routinely sentenced for attempted bank fraud based on their attempt to obtain fraudulent loans, even if their attempts were unsuccessful. (v.3 at 46-47). The court then ruled as follows:

> So that objection is overruled. I believe the intended loss is calculated correctly and I think there's no basis for me to reduce any restitution amount [sic] from that. I think all amounts that were credited have been deducted from the intended loss. And by the way, in this enhancement we're looking at, if the intended loss is between $550,000 up to $1.5 million, I don't think there's any way for me to calculate the intended loss less than $550,000 based upon what I'm seeing here. So that objection is overruled.

(v.3 at 47-48).

As the above colloquy demonstrates, both the government and the defense were confused about the application of the § 2B1.1 Commentary, and the court neither corrected their analyses nor solicited further evidence from the parties. The government and the Probation Office appeared to believe that once it was determined that intended loss – the $ 1 million-plus sum of the loans Ms. Conley sought – was greater than the amount of loss the financial institutions actually suffered, that was the end of the story. It also seemed to believe that if amounts repaid or collateral recovered were subtracted from the intended loss, it would serve to convert the intended loss into actual loss, violating Commentary Note 3(A)'s command to use the greater of intended or actual loss.

The defense, for its part, appeared to believe that if Ms. Conley collateralized her loans, or repaid portions of the loans, that meant she never *intended* to defraud the financial institutions of the full amount of the loans.

Neither party was correct. The proper procedure for calculating loss would have been to first determine the intended loss by adding up the total of the loans sought - $1,028,643.20 – and then subtracting the sum of all payments made on the loans prior to detection of the offense, as well as the value of collateral recovered. *See Crowe*, *supra*, 735 F.3d at 1237.

The court, however, was never given accurate information about the total number of payments made or the value of collateral recovered by the banks, nor information as to whether those payments were made before the offense was detected, as required by Commentary Note 3(E)(i). Instead, the court was only given the total restitution amount, which *might* be the same as the intended loss minus amounts credited under Commentary Note 3(E), but might not, because there is no information about whether the restitution includes prohibited amounts such as interest and late fees, or whether all of the payments on the loans were made prior to detection of the offense.

The court's error was twofold. As detailed above, the court first erred by failing to clearly articulate the correct legal analysis. Second, the court erred by concluding, without reference to any actual evidence provided to it, that there was

no way the total loss would have been reduced to less than $550,000. This Court recently confronted a similar situation in *United States v. Wieck*, 2021 WL 4949177 (10th Cir. Oct. 25, 2021), an unpublished opinion. In *Wieck*, the defendant solicited investments for working interests in oil wells, in exchange for labor and cash investments. *Id*. at *1. The defendant was to pay the investors their share of the revenue from the wells, minus the costs of production. *Id*. Instead, he and his wife used investors' money for personal expenses, resulting in his conviction for wire fraud and money laundering. *Id*. at *2-3.

At sentencing, the defendant disputed the loss and restitution calculations, $658, 26.92 and $358,256.92 respectively, because the court failed to subtract the costs of production from both figures. *Id*. at *4. The district court overruled the objections. Despite the fact that the government presented no evidence regarding the costs of production, the court reasoned that "operating expenses were a relatively small percentage of things," and said that even with a "liberal deduction for production costs," the loss amount for purposes of the guidelines would still be above the $550,000 threshold for a 14-level increase. *Id*.

This Court reversed. With respect to production costs, the Court found that no testimony at trial or sentencing established that production costs were negligible. *Id*. at *9. "A loss estimate," the Court noted, "is reasonable only when it is calculated under a reasonable method." *Id*. (*quoting United States v. James*, 592 F.3d

1109, 1115 (10th Cir. 2010)). Contrary to the government's assertion that there was

nothing to suggest production costs approached $100,000, the amount necessary to

push the loss below the threshold for a 14-level enhancement, the Court found that

multiple witnesses had testified that in any given month, production costs would

exceed revenue. *Id.* at 10. Because the government failed to present evidence that

would have supported the district court's finding that production costs were less

than $100,000, the Court reversed both the restitution and loss calculations. *Id.* at

11.

Here, the government presented no evidence regarding payments Ms.

Conley made on the loans, nor did it present any evidence regarding whether the

financial institutions were able to recover on pledged collateral. Thus, the only

evidence the district court had was the total restitution figure, which although it

might not have precisely reflected the value of the loans minus payments made, it

certainly was a plausible figure, and was well below $550,000. However, like the

district court in *Wieck*, the district court in this case found, without evidence, that

credits against the loss amount could not possibly bring the intended loss below the

$550,000 threshold for a 12-level enhancement. As in *Wieck*, the record does not

support the district court's conclusion. Consequently, this Court should vacate Ms.

Conley's sentence on the bank fraud counts and remand for further findings on: 1)

the sum of payments made by Ms. Conley on her loans; 2) the dates on which those

payments were made; and 3) the value of any collateral recovered by the financial institutions. The government must also ensure that no prohibited amounts, such as interest or late fees, are included within any loss calculation.

II. IN LIGHT OF THE SUPREME COURT'S RECENT DECISION IN *DUBIN V. UNITED STATES*, 599 U.S. ___ (2023), MS. CONLEY'S PLEA TO AGGRAVATED IDENTITY THEFT UNDER 18 U.S.C. § 1028A MUST BE VACATED, AS IDENTITY THEFT WAS NOT THE CRUX OF THE UNDERLYING OFFENSE

A. <u>Preservation and Standard of Review</u>

Rule 11 of the Federal Rules of Criminal Procedure provides that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). Here, because Ms. Conley did not object to the sufficiency of the factual basis for her pleas to four counts of aggravated identity theft, this Court reviews the matter for plain error. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Torres-Duenas*, 461 F.3d 1178, 1180 (10th Cir. 2006) (internal citations omitted). Under the plain error standard of review, this Court assesses whether the error is clear or obvious at the time of appeal, not at the time of conviction. *United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1260 (10th Cir. 2020).

B. The *Dubin* Opinion Significantly Narrows the Applicability of 18 U.S.C. § 1028A, Taking Ms. Conley's Admitted Conduct Outside Its Scope

18 U.S.C. § 1028A, entitled "Aggravated Identity Theft," provides that:

Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1). Ms. Conley does not dispute that subsection (c) includes bank fraud as a specified offense, nor does she dispute that a signature qualifies as a "means of identification." *See* § 1028A(c)(5); *United States v. Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014). The issue is whether she "use[d]" such means of identification "during and in relation to" her bank fraud offense.

Until recently, prosecutors – sometimes with the assent of the courts – interpreted the statutory terms "use" and "during and in relation to" broadly, sweeping in a vast array of conduct, even where the use of another's identity was tangential to the underlying offense and even where the individual whose identity was used suffered no actual or potential loss. *See, e.g. United States v. Munksgard*, 913 F.3d 1327 (11th Cir. 2019) (upholding § 1028A conviction, where defendant signed another individual's name to a surveying contract used to bolster a loan application, and rejecting defendant's argument that the act was only incidental to the loan fraud and that the individual suffered no loss); *United States v. Michael*, 882

F.3d 624 (6th Cir. 2018) (upholding § 1028A conviction where pharmacist included doctor's and patient's names on a fraudulent insurance claim, rejecting defendant's argument that because he made the claim in his own name, he did not "use" another's identity); *United States v. Gatwas*, 910 F.3d 362 (8th Cir. 2018) (upholding § 1028A conviction, where defendant listed names and social security numbers of children, including his own, on income tax returns he prepared for clients, who then obtained inflated returns). *But see*, *United States v. Hong*, 938 F.3d 1040 (9th Circuit 2019) (reversing a § 1028A conviction where defendant submitted false Medicare claims for different services than had been rendered, using patients' names and Medicare numbers to accomplish the fraud); *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2013) (reversing § 1028A conviction where defendants misrepresented the nature of the transportation services they provided when they submitted claims in patients' names).

On June 8, 2023, the Supreme Court issued an opinion in *Dubin v. United States*, 599 U.S. ___, 143 S.Ct. 1557 (2023), in which it analyzed the scope of § 1028. In *Dubin*, the defendant co-managed a psychological services company with his father. *Id*. at 1563. In connection with his responsibilities, Dubin submitted a Medicaid reimbursement claim for psychological testing by a licensed psychologist. *Id*. In fact, however, the evaluator was only a licensed psychological *associate*, reimbursable at a lower rate. *Id*. Based on this conduct, Dubin was charged with

healthcare fraud and aggravated identity theft. *Id*. The government's theory on the aggravated identity theft charge was that in connection with the healthcare fraud, Dubin "used" the patient's Medicaid reimbursement number, which constitutes a "means of identification" within the terms of § 1028A. *Id*. at 1564. The defendant, on the other hand, urged that the statute requires "'a genuine nexus to the predicate offense,'" and that Dubin's use of the patient's Medicaid number was too far removed from the fraud. *Id*. at 1564-65.

Both the district court and the Fifth Circuit expressed some misgivings about applying § 1028A to the defendant's conduct, noting that the "crux" of the case was fraudulent billing, not identity theft, and that Dubin's conduct did not seem to fit the term "identity theft." *Id*. at 1563-64. Nonetheless, both courts ultimately upheld the charge. *United States v. Dubin*, 47 F.4th 1021, 1024 (5th Cir. 2022) (*en banc*).

The Supreme Court, however, disagreed and reversed Dubin's aggravated identity theft conviction. As a starting point, the Court noted that the terms "use" and "in relation to" have been subject to varying interpretations, and unless read in context, could be extended far beyond a sensible interpretation of § 1028A. *Id*. at 1565. Acknowledging that under a literal reading of the statute, either the defense or the prosecution's interpretation of the "use-in-relation-to" requirement *could* be

correct, it held that context was especially important in interpreting § 1028A. *Id.* at 1566.

The Court first noted that the title of the statute, "aggravated identity theft," suggests that the defendant must use the stolen identity for the purpose of deceiving others *and* that the use must be at "'the locus of the [criminal] undertaking,' rather than merely 'passive,' 'passing,' or ancillary employment in a crime.'" *Id.* at 1568 (*quoting Jones v. United States*, 529 U.S. 848, 855-56 (2000)). The Court also highlighted the fact that the statute's title – "aggravated" identity theft – suggests that Congress meant to criminalize a "particularly serious form of identity theft." *Id.* at 1569.

The Court also reasoned that the inclusion of the term "uses" in the statute alongside the narrower terms "transfers" or "possesses" points to a narrower interpretation, grounded in the concept of theft:

> Congress thus employed a trio of verbs that capture various aspects of "classic identity theft." There is "the defendant [who] has gone through someone else's trash to find discarded credit card and bank statements, and thus has taken possession unlawfully. There is the bank employee who passes along customer information to an accomplice, and thus transfers it unlawfully Then there is use involving fraud or deceit about identity: "a defendant [who] has used another person's identification information to get access to that person's bank account.

*Id.* at \*1570 (*quoting Flores-Figueroa v. United States*, 556 U.S. 646, 656 (2009)). The Court further noted that § 1028A is a particularly severe penalty enhancement, adding a mandatory consecutive sentence to offenses that do not themselves merit

mandatory minimum sentences. *Id.* Consequently, the Court cautioned, it should only be applied to situations in which "the means of identification itself plays a key role – one that warrants a 2-year mandatory minimum." *Id.* at 1572.

Finally, the Court noted that interpreting the statute as the government proposed would result in a virtually unlimited reach to the statute, straying far from Congress' original intent. *Id.* at 1572-73. It concluded that the only sensible way to apply the statute would be to limit it to cases where the use of another's means of identification is at the "crux" of what makes the conduct criminal. Because the Court found Dubin's "use" of the patient's Medicaid identification number was incidental to the overbilling, it vacated his conviction. *Id.* at 1573-74.

In a concurring opinion, Justice Gorsuch, noting that the government's proposed expansive view of the statute would "'fall[] within the range' of plausible meanings the statute would support," nonetheless agreed with the majority that a more limited reading was warranted:

> The United States' maximalist approach has simplicity on its side, yes; an everybody-is-guilty standard is no challenge to administer. But the Constitution prohibits the Judiciary from resolving reasonable doubts about a criminal statute's meaning by rounding up to the most punitive interpretation its text and context can tolerate …. That insight alone means Mr. Dubin's § 1028A(a)(1) conviction cannot stand.

*Id.* at 1575 (Gorsuch, J., concurring) (internal citations omitted). However, he expressed concern that the majority's "crux" test would prove difficult to

administer, and ultimately opined that the statute was simply too vague to pass constitutional muster. *Id.* at 1576-77.

C. <u>In Light of *Dubin*, the District Court Plainly Erred in Finding a Sufficient Factual Basis for Ms. Conley's § 1028A Pleas</u>

In this case, Ms. Conley pled guilty without a written plea agreement to four counts of aggravated identity theft. (v.1 at 181-85). The only factual basis provided in her Petition to Enter Plea of Guilty was as follows:

On or about the dates set forth in the Second Superseding Indictment, and within the Northern District of Oklahoma, I schemed and executed a scheme to obtain money funds and credits from the financial institutions identified in Exhibit No. 1 to this Plea Petition. I executed the scheme by submitting false documents to obtain loans and to re-finance loans. I stipulate and agree that the financial institutions were insured by agencies of the federal government. Exhibit No. 1 contains a description of the false representations I made to obtain loans and to re-finance loans.

(*Id.* at 182). The above paragraph contains handwritten notes that state "Counts 1-24," initialed by counsel and Ms. Conley, and "Counts 25, 26, 27, 28 See Ex. No. 2," also initialed by counsel and Ms. Conley. (*Id.*). Exhibit 2 states:

On or about the dates set forth in the Second Superseding Indictment, within the Northern District of Oklahoma and in relation to the crimes set forth in Counts 1-24, I knowing [sic] utilized the names of [J.B.] (Count 25), [J.E.] (Count 26), [K.S.] (Count 27) and [R.D.] (count 28) and without their permission and authority to transmit lien releases to the Oklahoma Tax Commission to effect lien releases on mortgaged collateral.

(*Id.* at 190). During her change of plea hearing, to establish a factual basis for her guilty plea to Counts 25-28, Ms. Conley read from Exhibit 2 verbatim. (v.3 at 30-

31). Neither the parties nor the court questioned the sufficiency of the factual basis for her plea.

In light of *Dubin*, this Court should find that the district court plainly erred in finding a sufficient factual basis for the four aggravated identity theft charges, because her conduct, like that of Dubin's, was incidental to the underlying offense. In *Dubin*, the defendant's goal was to persuade Medicaid to release funds to him, even though his company did not provide services exactly as he claimed. In order to accomplish that goal, he had to use the name and Medicaid identification number of his patient. Here, Ms. Conley's goal was to persuade the financial institutions to lend her money; in order to accomplish that goal, she provided the banks and credit unions with a plethora of false information, including representations regarding her income, her employment status, and in four cases, the availability of certain property to serve as collateral. Because the property was already encumbered, she forged the signatures of individuals who had authority to release the liens on the property.

Like the patients in *Dubin*, the employees whose names were forged on the lien releases were not the victims of the underlying offense; they were merely one of many tools incidentally used to defraud the financial institutions. Also like the patients in *Dubin*, the bank employees in this case suffered no loss, or even any

potential loss. Thus, rather than being at the "crux" of the offense, the signature-forging played a minor, tangential role.

Nor was Ms. Conley's conduct "aggravated." She committed garden-variety bank fraud under 18 U.S.C. § 1344, a statute which contains no mandatory minimum sentencing provision. The Sentencing Guidelines already take into account the severity of the offense by tying the guideline range to the amount of loss suffered by the financial institutions. *See* U.S.S.G. § 2B1.1. That Ms. Conley falsified lien releases, in addition to providing false employment and income information, does not make the offense so qualitatively more serious that a doubling[3] of her sentencing exposure is warranted.

The legislative history to § 1028A further supports the conclusion that it was not intended to apply to conduct such as Ms. Conley's. As part of the background and need for the legislation, the House Report notes that the FTC evaluated 161,819 victim complaints of identity theft in 2002, and that they broke down as follows: "42% involved credit card fraud, 22% involved the activation of a utility in the victim's name; 17% involved bank accounts opened in the victim's name; 9% involved employment fraud; 8% involved government documents or benefits fraud, 6% involved consumer loans or mortgages *obtained in the victim's name*, and 16%

---

[3] Ms. Conley's guideline range for the bank fraud counts was 30-37 months; if the Court agrees with her argument in Section I, her guideline range would likely decrease to 24-30 months.

involved medical, bankruptcy, securities and other miscellaneous fraud." H.R. Rep. 108-528, 779-80 (2004). Further, the report provides six examples of identity theft targeted by the statute. In each one, individuals whose identifying information was stolen either suffered losses, or were exposed to a risk of loss. *Id.* at 782. The report thus makes clear that the statute was intended to apply to cases in which there is a nexus between the theft of the individual's identity and the use of the identity to the detriment of the victim.

*Dubin* arrives at the sensible conclusion that the aggravated identity theft statute was not intended to be applied to every conceivable situation in which a defendant can be characterized as "using" the identity of another "during and in relation to" another offense. Rather, the two-year mandatory consecutive sentence should only be applied in situations in which the theft of a victim's identity is at the center of the offense. Because that was not the case here, the district court plainly erred in finding that there was a sufficient factual basis for her pleas on the four aggravated identity theft claims.

D. The Error Affected Ms. Conley's Substantial Rights, and Undermines the Fairness and Integrity of the Judicial Proceedings

If a district court plainly errs in finding a factual basis for a guilty plea, a reviewing court may look to the entire record, including the PSR, to determine whether the error affected the defendant's substantial rights. *United States v. Landeros-Lopez*, 615 F.3d 1260, 1264 (10th Cir. 2010). In *Landeros-Lopez*, the defendant pled

guilty to conspiracy to traffic in methamphetamine, but in his plea colloquy, he denied knowing that methamphetamine was being sold by his roommate from his apartment, and denied receiving any of the proceeds. *Id.* at 1261. This Court found that the district court plainly erred in accepting the plea, because the defendant's statement did not provide a factual basis sufficient to establish the elements of conspiracy. *Id.* at 1263. Nonetheless, the Court found that the plea colloquy, when viewed in combination with facts set forth in the presentence report, to which the defendant did not object, provided a sufficient factual basis to support the plea, and that therefore the error did not affect the defendant's substantial rights. *Id.* at 1263-64.

By contrast, here the PSR provides no additional information that would support a factual basis for the § 1028A charges. Although the report contains a more detailed description of how Ms. Conley obtained the signatures she forged, the basic conduct remained unchanged: to persuade the banks and credit unions to issue her loans, she provided false income information, supported by fraudulent W-2 forms and false tax returns, and falsified lien release documents by forging the signature of individuals who had signed documents provided to her in connection with other loans. (v.5 at 6-7, ¶¶ 10-12). Notably, under the "Victim Impact" paragraph, only the financial institutions are listed as victims, and their losses

provided the factual basis for the restitution the court ultimately ordered. (*Id*. at 8, ¶ 17).

The third prong of plain error review is satisfied if a defendant can demonstrate that the record as a whole fails to establish a sufficient factual basis to support a guilty plea. *United States v. Carillo*, 860 F.3d 1293, 1301 (10th Cir. 2017) (*citing Landeros-Lopez, supra*, 615 F.3d at 1264 n.3). Moreover, Ms. Conley's convictions on the four aggravated identity theft counts had a profound impact on her sentencing exposure and on her ultimate sentence. As noted above, the bank fraud counts require no mandatory minimum sentence, and the district court was free to evaluate all of the factors set forth in 18 U.S.C. § 3553(a) in determining the appropriate sentence.

Not so with the aggravated identity theft charges. Not only did the charges carry a mandatory minimum two-year sentence, but the sentence was required to be imposed consecutively to the sentence on the bank fraud counts. *See* 18 U.S.C. § 1028A(a)(1). The only discretion afforded the court was whether to impose the four aggravated identity theft sentences concurrently or consecutive to one another, and the government did not seek consecutive terms. The court, after hearing argument from the parties, imposed a sentence at the low end of the guideline range (which as Ms. Conley argues above, was improperly calculated), and imposed a 2-year

sentence for the aggravated identity theft counts, consecutive to the sentence for the bank fraud counts. (v.3 at 70-71).

In *Carillo*, *supra*, this Court found that with respect to a similar error in accepting a guilty plea that lacked a sufficient factual basis, "[t]here is no doubt that failing to correct that error would seriously affect the fairness and integrity of judicial proceedings." 860 F.3d at 1307 (*citing United States v. Ferrel*, 603 F.3d 758, 763 (10th Cir. 2010)). Sentencing a defendant for crimes for which there is an insufficient factual basis similarly affects the fairness and integrity of the proceedings in this case. Accordingly, this Court should vacate Ms. Conley's aggravated identity theft convictions.

## CONCLUSION

Ms. Conley has been in custody since February 25, 2021, or for more than 28 months. Had she not been convicted of the aggravated identity theft counts, she would likely have been released by now. For that reason, Ms. Conley is filing, concurrently with this brief, a motion to expedite the determination of her appeal.

If the Court does not vacate her aggravated identity theft convictions, she respectfully requests that the Court reverse her sentence and remand to the district court for an evidentiary hearing to determine the correct loss amount for purposes of the Guidelines.

## STATEMENT REGARDING ORAL ARGUMENT

Because the guideline provision at issue is worded in a confusing manner and results in frequent errors in the district courts, Ms. Conley believes that oral argument would be helpful to the Court. Further, because of the change in the law ushered in by *Dubin*, if the Court believes that oral argument would assist it in determining the issue here, Ms. Conley requests oral argument at the earliest possible date, allowing the government sufficient time to respond.

Respectfully submitted,

*s/ Lynn C. Hartfield*
LAW OFFICE OF LYNN C. HARTFIELD, LLC
CJA Counsel for Appellant Pamela Conley
387 Corona Street, Suite 617
Denver, Colorado 80218
T: (720) 588-0571
lynn@lhartfieldlaw.com

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 7527 words. I relied on the word count tool that is included with my word processor, Microsoft Word for Mac, Version 16.74.

*s/ Lynn C. Hartfield*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I filed the foregoing **Appellant's Opening Brief** with the Clerk of the Tenth Circuit using the CM/ECF system, which will provide notice to all parties of record.

*s/ Lynn C. Hartfield*

# ATTACHMENTS

# ATTACHMENT 1

Judgment in USDC ND Okla. No. 4:21-00064

AO 245B    (Rev. 10/17) Judgment in a Criminal Case
            Sheet 1

# UNITED STATES DISTRICT COURT

### Northern District of Oklahoma

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| PAMELA KATHRYN CONLEY | ) | Case Number:    4:21CR00064–1 |
| | ) | USM Number:    31636-509 |
| | ) | |
| | ) | Meredith Blake Curnutte |
| | | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)    One through Twenty-Eight of the Second Superseding Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the Court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1344 | Bank Fraud | 12/28/20 | 1-24 |
| 18 U.S.C. § 1028A(a)(1) | Aggravated Identity Theft | 3/7/19 | 25-28 |

   The defendant is sentenced as provided in this Judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ The Indictment and Superseding Indictment are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid.  If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

November 18, 2022
Date of Imposition of Judgment

_Signature of Judge_

John F. Heil, III, Chief United States District Judge
Name and Title of Judge

November 23, 2022
Date

AO 245B    (Rev. 10/17) Judgment in Criminal Case
            Sheet 2 — Imprisonment

DEFENDANT:          Pamela Kathryn Conley
CASE NUMBER:        4:21CR00064-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of:   Fifty-four months.  Said sentence shall consist of 30 months as to each of Counts One through Twenty-Four to run
                 concurrently, each with the other, and 24 months as to each of Counts Twenty-Five through Twenty-Eight, to run
                 concurrently with each other but consecutively to Counts One through Twenty-Four.

☒   The Court makes the following recommendations to the Bureau of Prisons:
    The Court recommends that the defendant be evaluated for the Residential Drug Abuse Program.

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐   a.m.   ☐   p.m.   on   _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this Judgment as follows:


Defendant delivered on _____   to   _____

at _____ , with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By _____

_____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 10/17) Judgment in a Criminal Case
Sheet 3 — Supervised Release

DEFENDANT:              Pamela Kathryn Conley
CASE NUMBER:            4:21CR00064-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Three years.  Said terms shall consist of three years as to each of Counts One through Twenty-four and one year as to each of Count Twenty-five through Twenty-eight.  Said terms shall run concurrently, each with the other.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B    (Rev. 10/17) Judgment in a Criminal Case
Sheet 3A — Supervised Release

DEFENDANT:         Pamela Kathryn Conley
CASE NUMBER:       4:21CR00064-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervision, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when to report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by the probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

AO 245B     (Rev. 10/17) Judgment in a Criminal Case
            Sheet 3B — Supervised Release

---

DEFENDANT:        Pamela Kathryn Conley
CASE NUMBER:      4:21CR00064-1

# SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall successfully participate in a program of mental health treatment and follow the rules and regulations of the program. The probation officer, in consultation with the treatment provider, will determine the treatment modality, location, and treatment schedule. The defendant shall waive any right of confidentiality in any records for mental health treatment to allow the probation officer to review the course of treatment and progress with the treatment provider.  The defendant must pay the cost of the program or assist (co-payment) in payment of the costs of the program if financially able.

2. The defendant shall abide by the "Special Financial Conditions" previously adopted by the Court, as follows:
   a. The defendant shall maintain a checking account in the defendant's name and deposit into this account all income, monetary gains or other pecuniary proceeds, and make use of this account for payment of all personal expenses.  All other bank accounts must be disclosed to the probation officer.
   b. The defendant shall not make application for any loan or enter into any credit arrangement, without first consulting with the probation officer.
   c. The defendant shall disclose all assets and liabilities to the probation officer.  The defendant shall not transfer, sell, give-away, or otherwise convey any asset, without first consulting with the probation officer.
   d. If the defendant owns or maintains interest in any profit or nonprofit entity, you shall, upon request, surrender and/or make available for review, any and all documents and records of said profit or nonprofit entity to the probation officer.
   e. The defendant shall, upon request of the probation officer, complete a personal financial affidavit and authorize release of any and all financial information, to include income and tax return records, by execution of a Release of Financial Information form, or by any other appropriate means.

3. The defendant shall abide by the "Special Computer Restriction Conditions" previously adopted by the Court, as follows:
   a. The defendant shall disclose all e-mail accounts, Internet connections and Internet connection devices, including screen names and passwords, to the probation officer; and shall immediately advise the probation officer of any changes in his or her e-mail accounts, connections, devices, or passwords.
   b. The probation officer shall have authority to monitor all computer activity, to include all e-mail or Internet connections, to include but not limited to installation of remote monitoring software.  Unless waived by the probation officer, the cost of remote monitoring software shall be paid by the defendant.
   c. The defendant shall not access any on-line service using an alias, or access any on-line service using the Internet account, name, or designation of another person or entity; and report immediately to the probation officer access to any Internet site containing prohibited material.
   d. The defendant is prohibited from using any form of encryption, cryptography, stenography, compression, password-protected files or other methods that limit access to, or change the appearance of, data and/or images.
   e. The defendant is prohibited from altering or destroying records of computer use, including the use of software or functions designed to alter, clean or "wipe" computer media, block monitoring software, or restore a computer to a previous state.
   f. If instructed, the defendant shall provide all personal and business telephone records and credit card statements to the probation officer.

4. The defendant is prohibited from engaging, directly or indirectly, in any form of gambling or game of chance; and shall not loiter about or enter any dwelling or enterprise whose principal business purpose is gambling or the offering of games of chance.  The defendant shall successfully participate in a program for the treatment of gambling addiction at a program and on a schedule approved by the probation officer.  The defendant shall waive any right of confidentiality in any records for gambling addiction treatment to allow the probation officer to review the course of treatment and progress with the treatment provider.

**U.S. Probation Officer Use Only**

A U.S Probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this Judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions,* available at: www.uscourts.gov.


Defendant's Signature _____     Date _____

AO 245B   (Rev. 10/17) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

DEFENDANT:        Pamela Kathryn Conley
CASE NUMBER:      4:21CR00064-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $2,800 | $451,064.64 | N/A | N/A | N/A |

☐   The determination of restitution is deferred until

An *Amended Judgment in a Criminal Case (AO 245C)* will  be  entered after such determination.

☒   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise
in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the
United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or |
|---|---|---|---|
| **First Oklahoma Federal Credit Union**<br>1419 South Denver Avenue<br>Tulsa, Oklahoma 74119 | | $55,548.06 | |
| **Oklahoma Central Credit Union**<br>Attn: Shelli Schroeder<br>4956 South Peoria Avenue<br>Tulsa, Oklahoma 74105 | | $118,757.87 | |
| **First Pryority Bank**<br>10632 South Memorial Drive<br>Tulsa, Oklahoma 74133 | | $31,559.00 | |
| **Western Sun Federal Credit Union**<br>4620 West Kenosha,<br>Broken Arrow, Oklahoma 74012 | | $18,414.76 | |
| **Red Crown Credit Union**<br>5001 East 91st Street<br>Tulsa, Oklahoma 74137 | | $39,770.77 | |
| **Equity Bank**<br>Attn: June Pressnell<br>7701 East Kellogg Avenue<br>Wichita, Kansas 67207 | | $25,068.10 | |
| **Tinker Federal Credit Union -** Fraud Department<br>Attn: Jack Kelley<br>715 Metropolitan Avenue<br>Oklahoma City, Oklahoma 73108 | | $105,224.99 | |
| **Fidelity Bank NA**<br>Attn: Jennifer King<br>100 East English<br>Wichita, Kansas 67202 | | $27,059.43 | |
| **Grand Savings Bank**<br>198 Atlanta Street SE<br>Gravette, Arkansas 72736 | | $29,661.66 | |
| **TOTALS** | $ | $ 451,064.64 | |

☐   Restitution amount ordered pursuant to Plea Agreement  $

☐   The defendant must pay interest on any fine or restitution of more than $2,500, unless the restitution or fine is paid in full before the
   fifteenth day after the date of the Judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject
   to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒   The Court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☒   the interest requirement is waived for the   ☐   fine   ☒   restitution.

   ☐   the interest requirement for the   ☐   fine   ☐   restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.

\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on
or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 10/17) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

| | |
|---|---|
| DEFENDANT: | Pamela Kathryn Conley |
| CASE NUMBER: | 4:21CR00064-1 |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒  Lump sum payment of $ ___2,800___ due immediately, balance due

     ☐  not later than _____ , or

     ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B** ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C** ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this Judgment; or

**D** ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

**E** ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 90 days)* after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☒  Special instructions regarding the payment of criminal monetary penalties:

     Any monetary payment is due in full immediately, but payable on a schedule to be determined pursuant to the policy provision
     of the Federal Bureau of Prisons' Inmate Financial Responsibility Program if the defendant voluntarily participates in this
     program. If a monetary balance remains, payment is to commence no later than 60 days following release from imprisonment to
     a term of supervised release in equal monthly payments of $100 or 10% of net income (take home pay), whichever is greater,
     over the duration of the term of supervised release and thereafter as prescribed by law for as long as some debt remains.
     Notwithstanding establishment of a payment schedule, nothing shall prohibit the United States from executing or levying upon
     property of the defendant discovered before or after the date of this Judgment.

Unless the Court has expressly ordered otherwise, if this Judgment imposes imprisonment, payment of criminal monetary penalties
is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States:
     United States currency in the amount of $938,020.63 is forfeited as directed in the Forfeiture Money Judgment, Dkt. # 81.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

# ATTACHMENT 2
Excerpt of Sentencing Hearing, November 18, 2022

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4  UNITED STATES OF AMERICA,   )
                                )
 5                              )
                                )
 6             Plaintiff,       )
                                )
 7  vs.                         )         CASE NO. 21-CR-64-JFH
                                )
 8                              )
    PAMELA KATHRYN CONLEY,      )
 9                              )
                                )
10             Defendant.       )

11

12

13
                      TRANSCRIPT OF PROCEEDINGS
14                      NOVEMBER 18, 2022
               BEFORE THE HONORABLE JOHN F. HEIL, III
15                UNITED STATES DISTRICT JUDGE
                       SENTENCING HEARING
16

17

18  APPEARANCES:

19

20  For the Plaintiff:             MR. RICHARD CELLA
                                   U.S. ATTORNEY'S Office
21                                 110 W. 7th St., Ste 300
                                   Tulsa, OK 74119
22
    For the Defendant:             MS. MEREDITH CURNUTTE
23                                 Curnutte Law, PLLC
                                   2642 E. 21st St., Ste 290
24                                 Tulsa, OK 74114

25
```

1  your client as well as with the probation office?

2          MS. CURNUTTE:  Yes, Your Honor, and I believe there

3  was a revised -- a PSR that was issued this morning.

4          THE COURT:  I do see that.

5          MS. CURNUTTE:  Okay.

6          THE COURT:  I do have a revised presentence report

7  November 18th.  And have you had sufficient opportunity to

8  review that?

9          MS. CURNUTTE:  Yes, Your Honor.

10         THE COURT:  I have reviewed the defendant's

11 objections and supplemental objections.  And so what we need to

12 discuss now with the revised presentence report, whether there

13 remain any outstanding objections.  First of all, does the

14 government have any objections to the final presentence report?

15         MR. CELLA:  No, Your Honor.

16         THE COURT:  Ms. Curnutte, do you have any outstanding

17 objections to the final revised presentence report of November

18 18th?

19         MS. CURNUTTE:  Yes, Your Honor.  I would still

20 maintain my objection with regard to the total loss for

21 purposes of calculating the enhancement on that basis.

22         THE COURT:  All right.  Why don't you, if you don't

23 mind, set forth the basis for your objection in that regard,

24 because I want to make sure that I fully understand it, I

25 believe that I do, but I want to have a discussion about it.

1          MS. CURNUTTE:  Would you like me to approach?

2          THE COURT:  Yes, you can use the podium.

3          MS. CURNUTTE:  Your Honor, if you look under Section

4    2B1.1(b)(1), it specifically allows for an adjustment based on

5    the loss amount, and it references loss.  Probation is correct

6    in that there's two different types of loss that can be used to

7    make this determination which would be actual loss or intended

8    loss, but then that section goes on to provide comments of when

9    there would be situations when that loss would be adjusted.

10         I don't believe there's any limitations on application

11   note 3(E) only relating to restitution.  I think it applies to

12   loss as a whole, and it specifically allows the court and

13   requires the court to reduce loss by any amounts, including the

14   return of collateral or any money that is returned.

15         And I found a couple of cases from the Tenth Circuit that

16   have discussed that.  I noted two of those in my supplemental

17   objection to the PSR.  I also found an additional one, *U.S. v.*

18   *Gonzales*, 163 F. Supp. 3d 1078.  It states, "Comment Note

19   3(A)'s general rule that, loss is the greater of actual loss or

20   intended loss.  Commentary Note 3(A) is the starting point in

21   the calculation of loss whether actual or intended... However,

22   Commentary Note 3(E)(I) provides for a reduction if the

23   defendant returned any money.  In sum, holistically considering

24   the Commentary Note 2B1.1, the court concludes that Commentary

25   Notes 3(E)(i) and 3(B) do not conflict with Commentary Note

1  3(A)'s definition of loss as the greater of actual or intended

2  loss."

3      So I believe the court's determination or reading of that

4  particular section in the commentary notes would seem to

5  indicate that the loss amount should be reduced by any return

6  of property or any collection of collateral.

7          THE COURT:  All right.  So the revised presentence

8  report calculates the intended loss at $1,020,591.62.  What

9  returned amounts do you contend -- first of all, what amounts

10 do you contend were returned that were not included in that

11 amount, and what were they for?

12         MS. CURNUTTE:  Your Honor, the loans that resulted in

13 some of the defaults and that were included in the restitution

14 calculation total $640,795.25.  Of those loans, payments were

15 made on them, offsets were made with cash that was held in

16 checking accounts at those different institutions as well as

17 collateral was collected and sold --

18         THE COURT:  Right.

19         MS. CURNUTTE:  -- in order to offset.

20         THE COURT:  And I just want to know what were the

21 amounts that you -- I don't want to know -- what are the

22 amounts that you contend were not included in the deduction?

23 So we have a calculation of the intended loss of $1,020,591.62.

24 And I guess what I'm asking is, were there monies returned

25 and/or monies paid that you believe should be deducted from

1   that $1 million amount, and what are those amounts that you

2   believe were returned that were not deducted?

3            MS. CURNUTTE:  I believe that the total loss amount

4   should be the same as the restitution amount, that was the

5   amount of money that was actually lost.

6            THE COURT:  I understand, but the guidelines talk

7   about two different things.  They talk about the actual loss

8   and they talk about the intended loss, and those are two

9   different things.  And the PSR calculates the intended loss.

10  Do you have a -- do you maintain that that is not a way to

11  calculate?  It's the greater amount of the intended loss versus

12  the actual loss?  Are you quibbling with that?

13           MS. CURNUTTE:  No, Your Honor.

14           THE COURT:  Okay.  Okay.  And so on this basis, the

15  intended loss was greater than the actual loss; right?

16           MS. CURNUTTE:  Correct.

17           THE COURT:  And that's the amount that's been

18  calculated.  And that's the amount the court is going to use is

19  the intended loss because it's greater.  So my question is, do

20  you -- based upon the intended loss of $1,020,591.62, are there

21  certain amounts you believe should be deducted from those

22  because amounts were returned?

23           MS. CURNUTTE:  I do, Your Honor.  I believe that the

24  application note 3(E) would require the court to reduce that

25  total amount by amounts that were returned to the bank.

1          THE COURT:  Right.  And I'm wanting to know what

2  amounts were returned to the bank that were not deducted from

3  this intended loss calculation.

4          MS. CURNUTTE:  Judge, I don't have those exact

5  figures.  The figures that I do have are that the loans that

6  were defaulted on, total $640,700 -- I'm sorry, $640,795.25.

7  Of that number, there was a reduction -- I think the difference

8  would be the amount that's calculated for purposes of

9  restitution.

10          THE COURT:  Okay.  I think we're mixing two things.

11  I think in your answer you're mixing the actual loss versus the

12  intended loss.  And I'm trying to separate those things out,

13  because I'm not calculating the loss here based upon the actual

14  loss; I'm calculating it based upon the intended loss, and

15  we've done that, and that's what's set forth in the presentence

16  report.  And my inclination is to adopt that number, but if

17  you're telling me that number doesn't take into account certain

18  monies that were returned that need to be deducted, then I'm

19  willing to consider that.

20      And are you suggesting to me that any amount I order in

21  restitution should be deducted from the intended loss?  Are you

22  suggesting that?

23          MS. CURNUTTE:  Under my reading of that application

24  note, it's my understanding that you would deduct any amounts

25  that the victim didn't actually lose, which would include items

1  of collateral or money that was returned to them.

2        THE COURT:  Right, but that would be how we would

3  calculate an actual loss amount, but intended loss is something

4  different; right?

5        MS. CURNUTTE:  Uh-huh.

6        THE COURT:  Intended loss is the amount that the

7  victim could have lost, the amount that the defendant in the

8  case was trying to seek; those are different things.  Okay.

9     Well, let me ask you this:  Do you have an amount that you

10  believe is the intended loss?  Do you have a number there?

11        MS. CURNUTTE:  That would be the same as the total

12  restitution figure; however, there is still an outstanding

13  objection to the restitution with regard to Tinker Federal.

14        THE COURT:  I understand that.  And we'll get into

15  that in just a moment.  So first of all, let me deal with this

16  first objection, because it does seem like the probation

17  officer's determination of the intended versus the actual loss

18  amount is the higher the amount, which is the intended loss

19  calculated at $1,020,591.62 pursuant to U.S. Sentencing

20  Guideline, Section 2B1.1(b)(1)(H) in paragraph 23 of the

21  presentence report.

22     And I understand the defendant is contending that the loss

23  amount should be calculated as the restitution amount as

24  opposed to the intended loss amount.  Do I understand your

25  objection correctly?

```
 1              MS. CURNUTTE:  Yes, Your Honor.

 2              THE COURT:  Okay.  And so pursuant to U.S. Sentencing

 3   Guideline, Section 2B1.1, Comment Note 3(E), indicates ways

 4   that loss can be reduced.  And if I understand correctly, the

 5   defendant argues that because her loans were collateralized by

 6   checking accounts, vehicles and other property, because many of

 7   the loans were paid off with proceeds of new loans, and because

 8   various institutions recovered and/or set-off collateral, she's

 9   entitled to have the loss reduced in the amount of the

10   restitution.  Do I understand that correctly?  Is that your

11   objection?

12              MS. CURNUTTE:  Yes, Your Honor.  I don't believe the

13   government would be able to show that Ms. Conley actually

14   intended the loss amount that's included in the PSR because

15   those loans were collateralized.  So it appears that she

16   intended that if she defaulted on those loans that the banks

17   could then repossess that collateral, or she had sums in

18   checking accounts held with those banks that were later used to

19   offset as well.

20              THE COURT:  All right.  Let me hear from Mr. Cella on

21   that point.

22              MR. CELLA:  I think Your Honor hit it on the head.

23   What's happening here is defendant is conflating intended loss

24   and actual loss.  And to respond -- I mean, the fallacy of the

25   argument, Your Honor, is illustrated by the fact that 1344 and
```

1  the other fraud statutes criminalize attempt.  And we routinely

2  sentence defendants for attempted bank fraud and attempted wire

3  fraud, and the factor that drives their guideline sentence is

4  the intended loss.  So if the PPP fraud defendant intended to

5  obtain a million dollars in fraudulent loans and never received

6  a dollar, that figure would nonetheless drive their sentencing

7  guidelines.

8        In response to Ms. Curnutte, who contends that in this

9  case we would be unable to show that the scheme intended loss

10 in the amount reflected in the PSR, I'd point out that with

11 respect to the collateral as alleged in the indictment, and as

12 Ms. Conley admitted to, a facet of her scheme was falsifying

13 lien releases, that was a major component of the scheme.  She

14 submitted and doctored lien releases to the Tax Commission so

15 that these banks could not repossess their collateral.

16       The fact is that in restitution we're unable to compensate

17 these victims for attorney's fees and money and time spent

18 repossessing collateral or enforcing liens or determining that

19 many of these liens were false and fraudulent.  That's why for

20 sentencing we go by the intended loss that her conduct could

21 have caused and would have caused if it hadn't been thwarted

22 ultimately by criminal prosecution.

23       THE COURT:  So that objection is overruled.  I

24 believe the intended loss is calculated correctly and I think

25 there's no basis for me to reduce any restitution amount from

1    that.  I think all amounts that were credited have been

2    deducted from the intended loss.  And by the way, in this

3    enhancement we're looking at, if the intended loss is between

4    $550,000 up to $1.5 million, I don't think there's any way for

5    me to calculate the intended loss less than $550,000 based upon

6    what I'm seeing here.  So that objection is overruled.

7        So the other thing we need to deal with, I understand

8    there's objections to paragraph --

9            THE PROBATION OFFICER:  I apologize.  May I approach?

10            THE COURT:  Yes.  Yes, you may.

11        (OFF-THE-RECORD DISCUSSION WAS HAD.)

12            THE COURT:  All right.  Well, I'm just looking at

13    another part of the comment note that indicates that, for the

14    defendant to get credit for returned items or returned amounts

15    from the intended loss, she would have had to return that

16    before detection, and that's not -- doesn't seem to be the case

17    here at all, so the court's ruling stands.  The intended loss

18    has been calculated correctly by my observation.

19        But let's look at the defendant's objection to paragraph

20    84, which are the restitution amounts.  And I think what we

21    need to do is, we need to go through those one by one and see

22    if we can sort out what the differences are.

23        So paragraph 84 lists nine different victims and nine

24    different restitution amounts.  The first amount listed is

25    First Oklahoma Federal Credit Union in the amount of